AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Four Facebook accounts, more fully described in<br>Attachment A. | )<br>)<br>)  Case No.  MJ20-183<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, attached hereto and incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 113, 1111, 1112 | Assault within maritime and territorial jurisdiction; Murder; Manslaughter |

The application is based on these facts:

✓  See Affidavit of Special Agent Caryn Highley, continued on the attached sheet.

☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
Applicant's signature

Caryn Highley, Special Agent
Printed name and title

☐ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:  4/17/2020                         _____
Judge's signature

City and state:  Seattle, Washington          John L. Weinberg,  United States Magistrate Judge
Printed name and title

USAO: 2019R00348

1                                **AFFIDAVIT OF CARYN HIGHLEY**

2 STATE OF WASHINGTON        )

3                                 )     ss

4 COUNTY OF KING            )

5

6       I, Caryn Highley, a Special Agent with the Federal Bureau of Investigation

7 ("FBI"), Seattle, Washington, having been duly sworn, state as follows:

8                           **INTRODUCTION AND AGENT BACKGROUND**

9       1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and

10 have been since August 2014. While employed by the FBI, I have investigated federal

11 criminal violations related to violent crimes, illegal drug sales and distribution, gang

12 related criminal activities, child exploitation/child pornography, high technology or cyber

13 crime, and special jurisdiction matters. I am authorized to investigate and enforce

14 violations of federal criminal statutes, including those found in Title 18 and 21 of the

15 United States Code. I have received basic law enforcement training at the 20-week FBI

16 Academy. This training focused on various aspects of conducting criminal enterprise

17 investigations such as interviewing and interrogation techniques, physical and electronic

18 surveillance, development and management of confidential human sources, and arrest

19 planning and execution.

20       2.      The facts set forth in this Affidavit are based on my own personal

21 knowledge; knowledge obtained from other individuals during my participation in this

22 investigation, including other law enforcement officers; review of documents and records

23 related to this investigation; communications with others who have personal knowledge

24 of the events and circumstances described herein; and information gained through my

25 training and experience.

26       3.      Because this Affidavit is submitted for the limited purpose of establishing

27 probable cause in support of the application for a search warrant, it does not set forth

28 each and every fact that I or others have learned during the course of this investigation. I

*Affidavit of SA Highley - 1*
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

have set forth only the facts that I believe are necessary to establish probable cause to
believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 113, 18
U.S.C. § 1111, or 18 U.S.C. § 1112 will be found on the below listed Facebook accounts.

## **PURPOSE OF THIS AFFIDAVIT**

4.      I make this Affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)
to require Facebook for a warrant for information associated with the Facebook accounts
**johnnieB.EAZY (account identifier 100000860514228); john.fuentes.1217727
(account identifier 100024203054648); john.fuenfes (account identifier
100023026680115);** and **account identifier 100004617467232** (the "Subject Accounts"),
stored at premises controlled by Facebook, a social media platform headquartered at 1601
Willow Road, Menlo Park, CA 94025.  This information is further described in Attachment
A.

5.      As further discussed below, one of the Subject Accounts is the account of
J.B.S., who is now deceased in what is being investigated as a potential assault, homicide,
or manslaughter, in violation of 18 U.S.C. § 113, 18 U.S.C. § 1111, or 18 U.S.C. § 1112.
The remaining three Subject Accounts are the accounts of John FUENTES, one of the last
individuals known to have seen J.B.S. alive, and a suspect in the death of J.B.S.  J.B.S.
frequently used Facebook Messenger to communicate with others, as he did not have a
regular cell phone.  In addition, FUENTES told the mother of J.B.S. in September 2019
that he had sent messages to J.B.S. via Facebook Messenger after J.B.S. purportedly
(according to FUENTES) disappeared.  The content of any such communications could
serve to incriminate or exculpate FUENTES; the content of the communications found in
J.B.S.'s Facebook Messenger account could provide evidence regarding his last
whereabouts prior to his death; and the location data that may be contained in the Facebook
Accounts would provide evidence as to the physical location of J.B.S. or FUENTES in the
days leading up to J.B.S.'s death.

Affidavit of SA Highley - 2
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

6.      Accordingly, the search warrant would require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## PROBABLE CAUSE

7.      On the morning of June 23, 2018, shortly after 8:00 a.m., the body of an unidentified male was found washed ashore a small rock beach on Valdez Island, located just south of Gabriola Island, British Columbia (BC), Canada. Gabriola Island Royal Canadian Mounted Police Detachment and the BC Coroner's Service responded to Valdez Island to document the scene and remove the body. Based on the Forensic Identification Report, the unknown male appeared to be in his mid to late 20s and had several unique tattoos on his body. The body was bloated, weathered, and in extreme decomposition.  However, the condition of the skin was such that several unique tattoos were able to be documented. These tattoos were later used to positively identify the body as that of J.B.S., a United States Citizen, from Ocala, Florida.

8.      On February 5, 2019, a news article was published online stating that Canadian officials needed help in identifying the unknown male who had washed ashore on June 23, 2018 on Valdez Island. The article had two graphics depicting the body of a person and the location and look of several distinctive tattoos. D.S., the mother of J.B.S., and J.S., the father of J.B.S., saw the two graphics with the unique tattoos depicted and believed it was J.B.S.

9.      On March 21, 2019, D.S. and J.S. contacted the Royal Canadian Mounted Police and provided them with multiple photographs of J.B.S. and his tattoos. Based on those tattoos and unique jewelry found, the body was positively identified as J.B.S.

10.     On March 23, 2019, D.S. and J.S. called the Federal Bureau of Investigation (FBI) National Threat Operations Center to report the suspicious death of

their son, J.B.S. On March 29, 2019, D.S. and J.S. were interviewed over the telephone by FBI Special Agents (SA) Caryn J. Highley and SA William Mellott.

11.     In May 2018, J.B.S. was living with his parents in Ocala, Florida. J.B.S. had recently finished a job and was looking for work. While in Florida, J.B.S. was contacted by JOHN FUENTES and ANTONIO HALE, who were working on the fishing boat WHALE.  J.B.S. was told that their boat was short one man, and that J.B.S. could come out for 30 days and, if it went well, stay on for a three-month period and make $13,000 per month. J.B.S. was friends with HALE and FUENTES and had met them in Ocala, Florida when they lived at the Windsor Tower Apartments. J.B.S. agreed to take the job and contacted the owner of the fishing boat WHALE, WALTER SUOMELA, at 907-299-3984.

12.     On May 30, 2018, SUOMELA purchased a one-way ticket for J.B.S. with SUOMELA's Alaska Airlines Mileage credit card. On the same day, D.S. received two text messages from telephone number 954-445-8225 (a number investigators later associated with HALE), with J.B.S.'s flight details and confirmation number. The two messages read, "[J.B.S.] flight info:. AlaskaAir. #339 lv.Orlando at3:45 pm. to Dan Diego. Leave San Diego on Alaska Air flight#949 at 7:38pm to Seattle. Leave Seattle on Alaska Air flight #3439 at 11:38pm and arrive in Bellingham, Washington at 12:26 am Your confirmation code for these flights is:. ERDEBN".

13.     On May 31, 2018, J.B.S. missed his flight to Bellingham and was rescheduled on a later flight. According to records obtained from Alaska Airlines, J.B.S. departed Orlando International Airport (MCO) at 5:25 p.m. with a scheduled arrival into Portland International Airport (PDX) at 8:30 p.m. J.B.S. departed PDX at 10:52 p.m. and arrived at Bellingham International Airport (BLI) on May 31, 2018, at 11:48 p.m. According to those same records, both this ticket and the ticket referenced in Paragraph 12 were purchased by "Walter W Suomela," using the address "PO Box 3092, Homer, AK 99603"; the email address wsuomela04@yahoo.com; and the phone number 907-299-3984.  That address is the same address listed for SUOMELA on his credit report,

Affidavit of SA Highley - 4
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and where SUOMELA receives his bank account statements for a credit card account
2  with Bank of America and checking account with Alaska USA Federal Credit Union.
3  Subscriber and toll detail records requested from AT&T listed a "Walter Suomela" as the
4  subscriber for 907-299-3984 from December 2017 through at least November 2019; this
5  is also the phone number the U.S. Coast Guard used to contact Suomela as the owner of
6  the WHALE on June 2, 2018 following an oil spill incident in Puget Sound.  I therefore
7  believe SUOMELA purchased both tickets.

8          14.     J.B.S. had a personal cell phone—telephone number 352-246-2950—but it
9  did not have network service and he could only communicate with the device over Wi-Fi.
10 J.B.S. regularly used his Facebook Messenger account (over Wi-Fi) and D.S.'s cellular
11 phones to communicate. According to D.S., J.B.S.'s Facebook account is:
12 **johnnieB.EAZY (account identifier 100000860514228).**  Photographs from the account
13 display an individual matching the individual identified as J.B.S. by his mother, D.S.
14 Records from Facebook state that the user's name is the same as J.B.S.'s, list J.B.S.'s
15 Google email address as the registered email address, and list J.B.S.'s cell phone number
16 as one of the verified phone numbers for the account.

17         15.     Prior to leaving Florida, J.B.S. used both his Facebook Messenger account
18 and D.S.'s cellular phone—telephone number 352-275-2531—to communicate. J.B.S.
19 did not leave Florida with a cellular phone, but took a Samsung Tablet with him, which
20 he connected to available Wi-Fi networks. While J.B.S. was traveling, D.S. saw a public
21 post J.B.S. placed on his Facebook page attempting to reach HALE. D.S. contacted J.B.S.
22 and learned he was waiting at the airport for HALE to arrive. J.B.S. stated that his tablet
23 was dying and that he had left the charger back in Florida. J.B.S. used a stranger's phone
24 to make a call to his mother. D.S. reached out to HALE for J.B.S. HALE told D.S. to not
25 worry, and that they were bringing the boat down to Seattle and would get J.B.S. from the
26 airport.

27         16.     On June 1, 2018, D.S. received a call from J.B.S., who was using HALE's
28 phone. J.B.S. told D.S. he was on the WHALE and would talk to her and J.S. when he

Affidavit of SA Highley - 5
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  could. As of 2019, D.S. had two phone numbers for HALE saved in her contact list: 954-
2  445-8225 and 954-665-3828. D.S. could not recall which number had been used by J.B.S.
3  to call her.

4        17.     Both phone numbers for HALE received service through Sprint
5  Corporation. Subscriber and toll detail records requested from Sprint listed an "AntonW
6  Hale" as the subscriber for 954-445-8225 during the time period of November 16, 2017,
7  through September 17, 2018. The account billing address was 600 NW 2nd Street, Ocala,
8  Florida 34475.

9        18.     Subscriber and toll detail records requested from Sprint listed "ANTONIO
10 HALE" as the subscriber for telephone number 954-665-3828 during the time period of
11 February 16, 2018, through the date records were requested (April 29, 2019). HALE's
12 billing address was listed as 3938 NW 77th, Hollywood, Florida 33024. This is also the
13 same address listed on HALE's Florida State Driver's License.

14       19.      On June 2, 2018, at approximately 7:33 a.m., D.S. sent several text
15 messages with names and phone numbers "For Johnnie" to HALE's 954-665-3828.
16 Approximately five hours later D.S. received two text messages in response that read,
17 "Love you" and "Ask Dad what is the mythological goddess airs represent".
18 Approximately 10 minutes later, at 1:19 p.m., D.S. responded with "The God of war."
19 That was the last time D.S. or J.S. communicated with J.B.S.

20       20.     As stated earlier, J.B.S.'s body was recovered on the beach of Valdez
21 Island on June 23, 2018.  Because J.B.S. regularly communicated with others using his
22 Facebook Messenger account or Facebook wall posts, including his attempt to contact
23 HALE during this trip, the content and location records from J.B.S.'s Facebook account
24 could reveal his whereabouts or contacts in the time period between June 2, 2018, when
25 he last communicated with his parents, and June 23, 2018, when his body was found, all
26 of which would be evidence relating to his disappearance and the cause of his death.

27       21.     On June 4, 2018, D.S. sent several more text messages to J.B.S. at 954-665-
28 3828. She received no response. After approximately 30 days, D.S. became worried and

Affidavit of SA Highley - 6
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    texted HALE at 954-445-8225. Again, she received no response. D.S. attempted to
2    contact HALE multiple times via text message and voice call, but did not receive a
3    response until September 9, 2018. On September 9th, HALE called D.S. using 954-445-
4    8225 and the two spoke for just over 15 minutes. HALE told D.S.: that J.B.S. became
5    "skirmish" [sic] on the boat and began "talking about God." J.B.S. got off the boat in
6    Alaska where he met a female captain of another boat and decided to leave the WHALE
7    permanently. HALE said he told J.B.S. they would wait for him until 8:30 a.m. the next
8    day, however, J.B.S. did not show up the following morning and the WHALE and crew
9    left without J.B.S. onboard. That was the last time HALE saw J.B.S. HALE also
10   mentioned J.B.S. had borrowed $40.00 from FUENTES and $100.00 from HALE before
11   he left.

12        22.    The following day, D.S. received a text message from HALE with the
13   phone number "(352) 355-5541", which HALE indicated belonged to FUENTES.

14        23.    On August 29, 2019, D.S. called the phone number listed above for
15   FUENTES.  A woman who stated she was Terry Fuentes, FUENTES's wife, spoke with
16   D.S.  Terry Fuentes relayed that FUENTES had previously told her that J.B.S. had gotten
17   off the WHALE in Alaska after meeting a woman.  The wife also stated that FUENTES
18   had mentioned that J.B.S.'s belongings were still on the WHALE vessel.

19        24.    In September 2019, D.S. called FUENTES at a number provided by his
20   wife: 352-300-7397.  D.S. recorded the conversation using a recording device that had
21   been given to her by the FBI.  FUENTES similarly stated that J.B.S. had met a woman in
22   Alaska, left with her, and never returned to the WHALE.  FUENTES described the
23   unknown female as very small and wearing a coat that appeared to be swallowing her.
24   FUENTES also stated that SUOMELA and HALE were on the WHALE with him at the
25   time of this conversation. Finally, Fuentes stated that J.B.S. had left the WHALE in
26   Ketchikan, Alaska and that Fuentes had tried to contact J.B.S. via Facebook Messenger
27   after that point.

28

Affidavit of SA Highley - 7
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

25.     When J.S. and D.S. were first interviewed by law enforcement in March 2019, they provided three Facebook pages for FUENTES.  J.B.S.'s 11-year-old son recognized FUENTES on these Facebook pages as an individual who was friends with J.B.S. prior to the June 2018 WHALE trip.  Those accounts are the Facebook accounts with the usernames: **john.fuentes.1217727 (account identifier 100024203054648); john.fuenfes (account identifier 100023026680115); and John Fuentes (account identifier 100004617467232)**. Subscriber information for all three accounts list "John Fuentes" as the subscriber, and two of the three list a cell phone number that is listed as the backup number in subscriber records to Fuentes's cell phone number.  The following photographs were retrieved on April 9, 2020 from the publicly accessible versions of these Facebook pages; two of the accounts (**john.fuentes.1217727** and **john.fuenfes**) had the same photo of this individual displayed:



The final Facebook page for account **John Fuentes** had a photo displayed of what appeared to be the same individual as the two above accounts:



Fuentes's Florida driver's license photograph is:

Affidavit of SA Highley - 8
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



26.     The fact that these photographs displayed the same apparent person across all three accounts, which match the photograph of FUENTES on his Florida Driver's License, along with the subscriber information that matches information known to be associated with FUENTES, indicate to me that all three of these accounts are indeed used by FUENTES.

## BACKGROUND ON FACEBOOK

27.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

28.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.   This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

29.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly

Affidavit of SA Highley - 9
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

30.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

31.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the

Affidavit of SA Highley - 10
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos
2   associated with a user's account will include all photos and videos uploaded by that user
3   that have not been deleted, as well as all photos and videos uploaded by any user that have
4   that user tagged in them.

5          33.     Facebook users can exchange private messages on Facebook with other
6   users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users
7   can also post comments on the Facebook profiles of other users or on their own profiles;
8   such comments are typically associated with a specific posting or item on the profile.  In
9   addition, Facebook has a chat feature that allows users to send and receive instant messages
10  through Facebook Messenger.  These chat communications are stored in the chat history
11  for the account.  Facebook also has Video and Voice Calling features, and although
12  Facebook does not record the calls themselves, it does keep records of the date of each call.

13         34.     If a Facebook user does not want to interact with another user on Facebook,
14  the first user can "block" the second user from seeing his or her account.

15         35.     Facebook has a "like" feature that allows users to give positive feedback or
16  connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well
17  as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can
18  also become "fans" of particular Facebook pages.

19         36.     Facebook has a search function that enables its users to search Facebook for
20  keywords, usernames, or pages, among other things.

21         37.     Each Facebook account has an activity log, which is a list of the user's posts
22  and other Facebook activities from the inception of the account to the present.  The activity
23  log includes stories and photos that the user has been tagged in, as well as connections
24  made through the account, such as "liking" a Facebook page or adding someone as a friend.
25  The activity log is visible to the user but cannot be viewed by people who visit the user's
26  Facebook page.

27

28

Affidavit of SA Highley - 11
USAO #2019R00348

38.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

39.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

40.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

41.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

42.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and

Affidavit of SA Highley - 12
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner or others. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

43.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

Affidavit of SA Highley - 13
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

44.     Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to permit Facebook, and their representatives and employees, to assist agents in the execution of this warrant. Once issued, the search warrant will be presented to Facebook with direction that it identify the accounts described in Attachment A, as well as other subscriber and log records associated with the Subject Accounts, as set forth in Attachment B.

45.     The search warrant will direct Facebook to create an exact copy of the specified accounts and records.

46.     I, and/or other law enforcement personnel will thereafter review the copy of the electronically stored data, and identify from among that content those items that come within the items identified in Section II to Attachment B, for seizure.

47.     Analyzing the data contained in the forensic image may require special technical skills, equipment, and software. It could also be very time-consuming. Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common e-mail, database and spreadsheet applications do not store data as searchable text. The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well. Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. All forensic analysis of the data will employ only those search protocols and methodologies reasonably designed to identify and seize the items identified in Section II of Attachment B to the warrant.

Affidavit of SA Highley - 14
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

48.     Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of messenger communications, chat logs, files, payment records and documents, that identify any users of the Subject Accounts and communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

## **CONCLUSION**

49.     Based on the foregoing, I request that the Court issue the proposed search warrant.

50.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

51.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

Affidavit of SA Highley - 15
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Respectfully submitted,

CARYN HIGHLEY
SPECIAL AGENT, FBI

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the 17th day of April, 2020.

John L. Weinberg
U.S. MAGISTRATE JUDGE

Affidavit of SA Highley - 16
USAO #2019R00348

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>ATTACHMENT A</u>**

**PROPERTY TO BE SEARCHED**

The electronically stored data, information, and communications contained in, related to, and associated with, including all preserved data associated with Facebook, Inc. accounts **johnnieB.EAZY (account identifier 100000860514228); john.fuentes.1217727 (account identifier 100024203054648); john.fuenfes (account identifier 100023026680115);** and **account identifier 100004617467232** (the "Subject Accounts"), as well as all other subscriber and log records associated with the Subject Accounts, which are located at premises owned, maintained, controlled or operated by Facebook, Inc. a social media application provider headquartered at 1601 Willow Road, Menlo Park, California, 94025.

**ATTACHMENT B**

*Particular Things to be Seized*

I.   Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each of the Subject Accounts listed in Attachment A:

(a)   All contact and personal identifying information, including for user IDs: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(e)   All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(f)   All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All information about the Facebook pages that the account is or was a "fan" of;

(i)     All past and present lists of friends created by the account;

(j)     All records of Facebook searches performed by the account;

(k)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(l)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 113, 18 U.S.C. § 1111, 18 U.S.C. § 1112, between March 1, 2018 and January 1, 2019, limited to the following:

- All communications, in whatever form, between FUENTES and J.B.S.; between FUENTES and HALE; and between FUENTES and SUOMELA;

- All communications, in whatever form, between J.B.S. and FUENTES; between J.B.S. and HALE; and between J.B.S. and SUOMELA;

- All records, communications, content, or information relating to J.B.S. in FUENTES's account;

- All records, communications, content, or information relating to J.B.S.'s or FUENTES's location or whereabouts between May 31, 2018 and June 23, 2018;

- All records, communications, content, or information relating to the WHALE's voyage that began on June 2, 2018, including communications or content relating to the planning of that voyage;
- All records, communications, content, or information bearing on the views of FUENTES, HALE, SUOMELA, or any other person toward J.B.S.;
- All "check-in" and other location information for FUENTES and J.B.S.;
- Evidence bearing on the identity of the person(s) who created or used the user ID, including contact and identifying information, IP address information, and records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.